605 So.2d 469 (1992)
DADE COUNTY, Florida, a political subdivision of the State of Florida, Appellant,
v.
Malcolm MATHESON, Jr., et al., Appellees.
No. 92-1069.
District Court of Appeal of Florida, Third District.
July 21, 1992.
On Motion for Rehearing and Rehearing October 20, 1992.
Robert A. Ginsburg County Atty., and R.A. Cuevas, Jr. and Joni Armstrong Coffey, Miami, for appellant.
Jorden Schulte & Burchette and Dan Paul and Frank Burt and David Ashton, Miami, for appellees.
Hicks, Anderson & Blum, Miami, for the International Players Championships, Inc., as amicus curiae.
Before HUBBART, LEVY and GODERICH, JJ.
On Motion for Rehearing and Rehearing En Banc October 20, 1992.
LEVY, Judge.
In 1988, heirs of Malcolm and Julia Matheson initiated a lawsuit ("the first case") seeking to prevent Dade County from completing the construction of the International Tennis Center in Crandon Park on Key Biscayne. Specifically, the heirs claimed that the tennis complex, including the planned 12,000-seat permanent stadium, violated a deed restriction requiring Crandon Park to be used for public park purposes only.
The trial court ruled that the heirs were not entitled to the relief that they were seeking. The heirs appealed that decision to this Court. On May 22, 1990, this Court filed its opinion resolving the issues that had been raised before it by the parties in "the first case". White v. Metropolitan Dade County, 563 So.2d 117 (Fla. 3d DCA 1990). Thereafter, on September 24, 1990, the trial court issued a Final Judgment in conformity with the mandate of this Court that had been issued on June 15, 1990.
*470 In 1991, the heirs filed another lawsuit ("the second case") seeking to prohibit the construction of a 7,500-seat permanent stadium that Dade County intended to construct as part of the tennis complex. Dade County argued before the trial court, in the second case, that the question concerning the construction of a tennis stadium had already been determined in the White case decided by this Court in mid-1990. In the Final Judgment rendered by the trial court in the second case, on May 8, 1992, the County was permanently enjoined and prohibited from further construction of the tennis stadium. The County now appeals to this Court from that Final Judgment.
The heirs argue that it was permissible for them to file the second case, rather than seeking relief within the context of the first case before the judge having jurisdiction of that case, because of their contention that this Court's opinion in White, which emanated from the appeal filed in their first case, did not address or resolve the question as to whether the construction of a stadium in the tennis complex would violate the deed restriction that was the subject of the litigation in the first case. Rather, the heirs argue that White only addressed the way that the tournaments were conducted and the general concept of a tennis complex, and how such a complex might affect the deed restriction, without specific consideration being given to the construction of a permanent tennis stadium. We disagree.
The County's argument before this Court, which is identical to its position before the trial court in the second case, is based upon the contention that the ultimate issue of whether or not a stadium may be built as part of the tennis complex has already been decided by the White court. Specifically, the County argues that when the White court held that the concept of a tennis complex did not violate the deed restriction,[1] the court was envisioning a stadium[2] as being included within the complex. We agree. It is clear that the White court both addressed and resolved the question as to whether the construction of a stadium in the tennis complex violated the deed restriction. Concerning this issue, we note the following portions of the White opinion:
We will therefore consider whether the tennis complex, including the stadium, should be required to undergo DRI review ...
White, 563 So.2d at 129 (emphasis added).
The construction of the "tennis complex," including the projected stadium, even though it is to be accomplished in phases, ...
White, 563 So.2d at 130 (emphasis added).
We therefore reject Dade County's assertion that it is premature to require the tennis complex, including the projected tennis stadium, to undergo DRI review.
White 563 So.2d at 131 (emphasis added).
Accordingly, it was legally impermissible for the heirs to ask the Circuit Court trial judge, in the second case, to rule upon the same question that had already been heard and decided by the District Court of Appeal in White.
The County next contends that the heirs lack the standing necessary to contest the construction of the stadium. That question was also addressed and resolved in White wherein the court stated:
Since this restriction in the deed was intended for the benefit of the heirs of the grantors, we concur that the appellants/heirs *471 have the requisite standing to enforce the deed restriction.
White, 563 So.2d at 123.
Neither the County nor the heirs filed any motions for rehearing or clarification in connection with this Court's May 22, 1990, Opinion or the trial court's September 24, 1990, Final Judgment. Furthermore, none of the parties involved in the first case sought to have the White opinion reviewed by the Florida Supreme Court. Accordingly, and with the apparent acquiescence of all of the parties in the first case, the decision rendered in White is now binding on all of the parties involved in that case. Seaboard Coast Line Railroad Company v. Industrial Contracting Company, 260 So.2d 860 (Fla. 4th DCA 1972).
The heirs' arguments before the trial court, and this Court, focused solely on the question of whether the construction of the proposed stadium violated the deed restriction. Despite the fact that the current proposed plan involves a contract through which the County agreed to give the United States Tennis Association "exclusive" use (whereby the public could be excluded from even viewing U.S.T.A. activities) of twelve of the seventeen hard courts and four of the eight clay courts at the tennis complex virtually all day, on every Thursday, Friday, Saturday, and Sunday all year long, the heirs specifically advised the trial court, and this Court at oral argument, that they did not want the Court to consider these facts or to address the question of how the tournament was going to be run or whether it amounted to a "virtual ouster" of the public from the tennis complex itself. In addition, the heirs advised this Court at oral argument that they did not want this Court to address the fact that the total number of parking spaces that would be needed in connection with a single day of the tournament was large enough so as to appear to require the County to apply for, and receive, approval as a Development of Regional Impact. Accordingly, since this Court is only permitted to rule on the questions presented to it, we specifically do not address the manner in which the tournament will be run, the "virtual ouster" question, or the need for DRI approval.
The County correctly acknowledges that anyone with the proper standing who wishes to challenge the nature or design of the stadium or any other part of the tennis complex, including questions of how tournaments are run or whether the public is being improperly ousted from the use of the park in violation of the deed restrictions litigated in the White case, would have the right to go back before the original trial court, who has jurisdiction over this matter, to seek the appropriate relief or enforcement, be it of a equitable nature or otherwise.[3]
For the foregoing reasons, the Final Judgment rendered by the trial court on May 8, 1992, is reversed, and the trial court is directed to dismiss the remaining portion of the Complaint filed by the heirs, to-wit: Count II. The said dismissal is to be without prejudice to any party having legal standing to initiate an appropriate proceeding, before the trial judge having jurisdiction of the first case, to ensure complete compliance with the trial court's Final Judgment entered on September 24, 1990.
Finally, the heirs cross-appeal the trial court's dismissal of Count I of their Complaint which sought to have the entire Tract 2 portion of Crandon Park revert back to them pursuant to the reverter clause contained in the deed. Clearly, the heirs gave up their right to seek such relief in the first case. As noted in the White opinion,
Appellant/heirs, however, clearly represented to this court and the trial court that they were not seeking a reversion. What appellant/heirs want is a declaratory judgment that all use of the park is in violation of the deed restriction and an injunction to prevent any further erosion of the "public park purposes only" deed restriction.
*472 White, 563 So.2d at 126. Florida law generally provides under the "rule against splitting causes of action," that all damages sustained by a party as the result of a single wrongful act must be claimed and recovered in one action. Gaynon v. Statum, 151 Fla. 793, 10 So.2d 432 (Fla. 1942); Schimmel v. Aetna Casualty & Surety Company, 506 So.2d 1162 (Fla. 3d DCA 1987), abrogation recognized on other grounds, Robinson v. State Farm Fire & Cas. Co., 583 So.2d 1063 (Fla. 5th DCA 1991); Thermofin, Inc. v. Woodruff, 491 So.2d 344 (Fla. 4th DCA 1986). As this Court recognized in Schimmel v. Aetna Casualty & Surety Company, 506 So.2d at 1164:
The rule against splitting causes of action requires that all damages sustained or accruing to one as a result of a single wrongful act must be claimed and recovered in one action or not at all. The rule is founded on the sound policy reason that the finality it establishes promotes greater stability in the law, avoids vexatious and multiple lawsuits arising out of a single incident, and is consistent with the absolute necessity of bringing litigation to an end.
Especially in cases where a party voluntarily drops a claim in a first action, and then later seeks to maintain a separate second action on the abandoned claim, the rule against splitting causes of action applies to preclude that party from maintaining the separate second suit on the abandoned claim. See Casto v. Arkansas-Louisiana Gas Co., 597 F.2d 1323 (10th Cir.1979); Johnson v. Southwestern Battery Company, 411 P.2d 526 (Okl. 1966). Accordingly, the trial court's dismissal of Count I of the heirs' Complaint is affirmed.
Affirmed in part, reversed in part, and remanded with directions.
Before SCHWARTZ, C.J., and BARKDULL, HUBBART, NESBITT, BASKIN, FERGUSON, JORGENSON, LEVY, GERSTEN and GODERICH, JJ.

ON MOTION FOR REHEARING
PER CURIAM.
Motion denied.

ON MOTION FOR REHEARING EN BANC
PER CURIAM.
Motion denied.
SCHWARTZ, C.J., and BARKDULL, HUBBART, NESBITT, BASKIN, JORGENSON, LEVY, GERSTEN and GODERICH, JJ., concur.
SCHWARTZ, Chief Judge (specially concurring).
I share many, if not all, the concerns expressed in Judge Ferguson's opinion. I nevertheless concur in the denial of the motion for rehearing en banc only because of the very limited holding of the panel opinion. It states only, as, it is clear, the opinion in White v. Metropolitan Dade County, 563 So.2d 117 (Fla.3d DCA 1990) sub silentio holds, that a stadium does not per se violate the deed restriction in question. As the panel opinion also explicates, however, every other issue concerning the conduct of the proposed tournament, the building of the specific stadium, and the operation of the facility  including the "virtual ouster" question, the requirement of appropriate approval as a Development of Regional Impact and all of the other matters considered in White  must be determined by the White trial court, subject of course to the holdings in White and subsequent review by this court. On this basis alone, I concur in the denial of en banc consideration.
LEVY and GERSTEN, JJ., concur.
FERGUSON, Judge (dissenting to denial of rehearing en banc).
This case should be heard by the full court because it is of great public importance, is in irreconcilable conflict with White v. Metropolitan Dade County, 563 So.2d 117 (Fla. 3d DCA 1990), on which it purports to rely, and is in conflict with a *473 decision of this court on the question of standing to enforce a restrictive covenant.
In language that needs no interpretation the White court wrote:
In [this] ruling that the holding of the Lipton tournament violates the deed restriction, we note that a distinction must be made between "park purposes" and "public purposes." Assuming arguendo that the Lipton tournament is an economic success which brings innumerable benefits to Dade County and its citizens, such an undeniable public purpose is not consistent with a deed restriction mandating the narrower "public park purposes only."
Id., at 124. The panel in this case says that the White court, in the same breath, then approved the construction of a stadium in Crandon Park for the Lipton Tournament. That conclusion is neither reasonable nor supported by the earlier opinion.
By accepting the County's strained argument for that proposition, the panel has become an unwitting accomplice to a power move, as the Mathesons contend, which would hasten construction and schedule the next tournament before the real parties in interest can be heard.[1] If stadium construction is resumed based on a misinterpretation of the opinion in this case, the legal issues will be mooted. Any subsequent review would be limited to a ceremonial balancing of economic interests against relatively impotent environmental and public safety concerns. It goes without saying that once the multi-million dollar coliseum is constructed at taxpayers' expense the tournaments will go forward despite deed violations and adverse environmental impacts.

Questions Presented
Three specific and interrelated questions are deserving of en banc review: (1) where one appellate court panel has determined that a proposed tennis tournament, in a predominantly low-density residential and "environmentally sensitive parkland," violates a "public park purpose" use restriction as the term is used in a restrictive covenant, whether another panel of the same court may, or should, approve the construction of a stadium to be used specifically for that tournament; (2) whether property owners living in proximity to land encumbered by a use restriction for public parks may sue to enforce the covenant where the court recognizes that the residents may be adversely affected by the proposed activity or may be "virtually ousted" from use of the land as a park; and (3) where the court has recognized environmental impact and public ouster as critical factors to a determination that a public park purpose restriction in a covenant has been violated, whether a conclusion may be reached that there is no deed restriction violation in constructing an edifice for that purpose before there is a factual determination that the proposed use will not cause environmental harm and that the public will not be virtually ousted. The last issue assumes, for the sake of argument, that the deed violation issue was not previously litigated.

Conflict With The White Opinion
Key rulings made in the White decision are the law of this case and are unchanged by any material occurrences or evidence presented after remand. First, and most significant, is that "Dade County took part *474 of the land deeded by the Mathesons and used it for the development of the Lipton Tournament Tennis Center." Id. at 120. In finding that the deed restriction was violated, the White panel further held that (1) "the public ... is deprived from using these tennis facilities for a period of three to four weeks during the Tournament Period," (2) "operation of the Lipton tournament ... does amount to the virtual ouster of the public from the park for periods of time during the two-week tournament," (3) "the tournament apparently takes up all the available public parking spaces at Crandon Park ... during the tournament ... [t]his is a public park parking nightmare," and in conclusion, (5) "Dade County [is] in violation of the deed restriction." Id., at 125-26.
At the heart of the controversy in this second review is the proposed construction of a stadium for the Lipton Tournament on "environmentally sensitive parkland" located on the island of Key Biscayne. A corollary question was presented to the panel in the first review  whether holding the international tennis tournament on the island violated the deed restriction in the first place.
First, the panel says that the White opinion holding that the "concept" of a tennis complex did not violate the deed restriction was a holding that the proposed Lipton Tournament stadium did not violate the restriction, citing to pages 123 and 126. What is to be found at page 123 is merely an observation, in reliance on Hanna v. Sunrise Recreation, Inc., 94 So.2d 597 (Fla. 1957), that a tennis complex, in the abstract, may be a permissible public park use.[2] To be found on page 126 is the gratuitous statement that "[o]ur ruling does not prevent Dade County from using the tennis complex for [any] tennis tournaments". That language, however, follows the ringing holding that the Lipton Tournament is a "violation of the deed restriction." Nowhere in the White opinion is there a holding, even inferentially, that the construction of a stadium to accommodate the Lipton Tournament is consistent with the "public park purposes only" restriction found in the deed.[3]

Standing To Enforce A Restrictive Covenant
A restrictive covenant in a deed, unlike a police power limitation on the use of land, does not necessarily involve general public welfare concerns. Such covenants are private promises or agreements creating negative easements or equitable servitudes which are enforceable as rights arising out of a contract. Board of Public Instruction v. Town of Bay Harbor Islands, 81 So.2d 637 (Fla. 1955). Whether a litigant seeking to enforce the covenant is among that narrow class of persons who have standing is a question of fact. Osius v. Barton, 109 Fla. 556, 147 So. 862 (1933). It is established as a matter of law, however, that those persons entitled to enforce the promise include "those in the neighborhood who may be considered [intended] beneficiaries *475 of the contract." Silver Blue Lake Apts., Inc. v. Silver Blue Lake Home Owners Ass'n, 245 So.2d 609, 611 (Fla. 1971); Osius, 147 So. at 868; Batman v. Creighton, 101 So.2d 587 (Fla. 2d DCA 1958). We held, in City of Miami Beach v. Kline, 189 So.2d 503 (Fla. 3d DCA 1966), that property owners in a neighborhood near a golf course were proper parties in an action to enforce a covenant requiring the property to be used only for "golf course purposes." This case is factually indistinguishable. Contrary to the panel's holding, those plaintiffs who are residents of Key Biscayne, assuredly, would have standing to enforce the covenant.[4]
There is another aspect of the panel opinion which begs for clarification. It is noted at the outset  incorrectly  that the plaintiffs who are not heirs of the grantor have no standing to enforce the covenant. Then the panel recognizes the holding of White that whether the deed restriction has been violated turns on how the stadium will be constructed, whether the tournament will be disruptive to the area and whether the public will be ousted from use of the complex  legitimate concerns of those who may not be heirs of the grantor. Nevertheless, the panel finds that there is no violation of the restrictive covenant even though others who have standing  including those who were previously determined to be without standing  may "challenge the nature or design of the stadium ... how tournaments are run or whether the public is being improperly ousted from the use of the park in violation of the deed restrictions litigated in the White case." What is the trial judge to do on remand?

Conclusion
In summary, the prominent conflicts and internal inconsistencies presented by the panel opinion are: (1) a stadium may be constructed for the Lipton Tournament even though the earlier opinion held that conducting the tournament in the park violates the deed; (2) some of those same persons who the first panel said had no standing are the real parties in interest who may have some after-the-fact standing; (3) whether the public will be ousted from the park by operation of the Lipton Tournament, and whether a stadium for the Lipton Tournament violates the deed, are issues still to be litigated, although there is a recognition that whether the tournament itself violates the deed has already been litigated; and (4) the trial court's order enjoining stadium construction was erroneous even though there are parties with standing who have yet to be heard on whether the stadium violates the deed restriction. I submit, respectfully, that the panel opinion is confusing.
The trial judge's injunction order, which halted stadium construction, flowed logically from and was imminently correct in light of the White opinion. Those findings and holdings made in the earlier case are the law of this case and are binding unless found, specifically, to be manifestly erroneous or unjust. In my view the en banc court should reconcile the two opinions rendered in this cause of action and give clear directions to the trial court.
NOTES
[1] Although the White opinion reflected the fact that this Court felt that there were legal problems presented by (1) the manner in which the tennis tournaments would be conducted (amounting to a "virtual ouster" of the public from the park), and (2) the fact that the County had not applied for and received approval as a development of Regional Impact, and (3) the fact that the planned complex affected zoning in a manner inconsistent with Dade County's Master Plan, the White decision made it clear that the concept of a tennis complex, in and of itself, did not violate the deed restrictions. White, 563 So.2d at 123 and 126.
[2] In fact, the proposed stadium considered by the White court contained more than 4,000 more permanent seats than is to be contained in the proposed stadium that is now being challenged in the second case.
[3] The proper trial judge to entertain such a matter would be the trial judge who has jurisdiction over the first case in which the final judgment was rendered on September 24, 1990, in response to this Court's mandate issued in White.
[1] The fears expressed by the appellees are well-founded. White v. Metropolitan Dade County held that the projected stadium was subject to Development of Regional Impact reviews pursuant to section 380.06, Florida Statutes. Id., at 130. The court in White held further that the law does not allow developers to commence construction without obtaining a final development order or a preliminary development agreement.

DRI reviews are time-consuming proceedings which focus, intensely, on matters of public health and safety, and inquire into, among other things, whether adequate public infrastructure exists to accommodate the development and whether the development will result in material adverse impacts to existing resources. Because the island of Key Biscayne is connected to the mainland by a single often-congested causeway, the DRI review takes on increased significance.
The panel treats the subject as if it had not been litigated in the first case. After White was released, however, Dade County attempted to circumvent this court's mandate by obtaining from the state land planning agency a waiver of the DRI reviews. The propriety of that action is yet to be tested which, alone, is a basis for affirming the injunction order.
[2] Dade County's reliance on Hanna v. Sunrise Recreation, Inc., as support for its contention that the tennis complex was consistent with the deed restriction was expressly rejected in White. The White panel noted that the facts in Hanna, which involved a public golf course, were different from the facts in this case where the public would be deprived from using the facilities for a period of three to four weeks during the tournament.

As the Hanna court observed, tennis courts and golf courses are permissible public park uses when the facilities are accessible "for the use by and enjoyment of the public" as is the case with playgrounds, dancing facilities, a swimming pool, bathhouse, horseshoe pitching, walking, horseback riding, and other outdoor activities. It is still to be decided whether the proposed stadium, which will block off access to the tennis courts except on terms and conditions as fixed by the private operator, is a Hanna-type public park use.
When White was heard in the trial court, a stadium was only a future possibility. Subsequently, according to the appellees, final plans were submitted for the construction of a "55 foot high, three tier structure with hundreds of offices and facilities built into it (and with provisions for 14,000 seats during the Lipton tournament)."
[3] Pages 129-131 of the White opinion, referred to by the panel, discusses Development of Regional Impact review as a pre-construction requirement. That discussion is irrelevant to the issue of whether the stadium violates the deed restriction. The court's discussion of the deed restriction violation ends on page 126.
[4] Heirs of the grantors have standing to enforce the covenant because of their beneficial interest in the reversion if the public park purpose is found to have been violated. See generally Maurice T. Brunner, Annotation, Who May Enforce Restrictive Covenant or Agreement as to use of Real Property, 51 A.L.R.3d 556 (1973). That standing is not exclusive. Non-heirs, such as owners of property in proximity to the servient lands, have standing where it is shown that they are intended beneficiaries of the negative easements or servitudes created by the use restrictions. Silver Blue Lake Apts., Inc., 245 So.2d at 611.